**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Walter CORTES, Defendant–Appellant.**

**No. 01–50352.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 3, 2002.

Filed Aug. 6, 2002.

Carole C. Peterson, Assistant United States Attorney, Los Angeles, CA, for the plaintiff-appellee.

Michael Tanaka, Deputy Federal Public Defender, Los Angeles, CA, for the defendant-appellant.

Before PREGERSON, TROTT, Circuit Judges, and FITZGERALD,* District Judge.

* The Honorable James M. Fitzgerald, Senior    United States District Judge for the District of

## OPINION

TROTT, Circuit Judge.

Walter Cortes ("Cortes") was convicted of attempted carjacking in violation of 18 U.S.C. § 2119 ("carjacking statute"). Cortes requested a sentencing reduction to account for his acceptance of responsibility. The district court denied that request and sentenced Cortes to 97 months in prison.

On appeal, Cortes attacks the carjacking statute as an unconstitutional abuse of Congress's Commerce Clause authority. Cortes appeals also his sentence insofar as it fails to account for his acceptance of responsibility. We have jurisdiction pursuant to 28 U.S.C. § 1291. Joining our Sister Circuits, we hold that Congress may constitutionally regulate carjacking as an activity that substantially affects interstate commerce. However, we vacate Cortes's sentence because the record does not reflect whether the district court appropriately evaluated the factors germane to Cortes's requested acceptance of responsibility reduction.

## BACKGROUND

After leaving work at Home Depot around midnight, Cortes and some friends went to the local speakeasy to shoot pool and drink beer. Shortly before 2:00 AM, they shunned the pub in favor of a public park, where they continued drinking beer as well as Hennessey Cognac. At some point, for an undisclosed reason, Cortes removed his clothes—except for his boxer shorts.

A short time later, Cortes fought with one of his friends, Andres Ruiz. After the fight, Cortes fled from the area. Nearly naked and separated from his comrades, Cortes tried to keep a low profile; so

naturally, he looked for a car to steal. Cortes was unsuccessful in hotwiring a flashy Camaro, but he was able to boost its stereo. Cortes, nevertheless, continued looking for a car to steal.

At 4:45 AM, Cortes arrived at a 7–Eleven just as Oscar Ramos ("Ramos") was exiting with his early morning necessities. Cortes accosted Ramos in the parking lot and demanded his car keys. Ramos refused and returned to the store. Cortes followed Ramos into 7–Eleven and stalked Ramos to and fro through the aisles while accusing Ramos of shooting and killing his sister—indeed, an odd accusation given that Cortes does not have a sister.

Apparently tiring of hide-and-seek with Ramos, Cortes sought out "someone who did not look too tough." In the parking lot, Cortes spied a 7–Eleven customer who apparently fit the bill. As it happens, however, Cortes unwittingly selected plain-clothed FBI agent, Samuel Whitman ("Whitman"), who was on his way to an undercover surveillance assignment. Whitman had observed the shenanigans inside the 7–Eleven and was retrieving his revolver so that he might quell the disturbance.

Cortes approached Whitman and demanded the keys to Whitman's government-issued blue Oldsmobile. Whitman displayed his badge and refused to relinquish the keys, whereupon Cortes struck him in the face with the Camaro's car stereo he was still holding. A vigorous struggle ensued; at one point both combatants fell to the ground. Cortes swung furiously with the car stereo and connected a few more times, chipping several of Whitman's teeth and lacerating his lips

Alaska, sitting by designation.

and gums. Whitman required plastic surgery to repair his facial damage.

By the time Whitman finally accessed his gun, Cortes was already fleeing the scene. Cortes sought refuge in the early morning shadows of the neighborhood until he realized he would eventually be apprehended. At that point, he sat down and waited. Later that morning, a Los Angeles Police Department officer noticed Cortes reposed on the sidewalk a quarter-mile from the 7–Eleven. The officer described Cortes as intoxicated somewhere between the level of "not being able to drive and not being able to care for himself."

Cortes was indicted for attempted carjacking. Cortes moved to dismiss the indictment on the ground that Congress exceeded its Commerce Clause authority in enacting the federal carjacking statute. The district court denied the motion. After a trial, the jury returned a unanimous guilty verdict.

At sentencing, Cortes argued that the district court should reduce his sentence for an array of reasons, including his acceptance of responsibility. The district court rejected Cortes's arguments for downward adjustment and instead adopted the presentence report's ("PSR") calculations of an Offense Level of 30 and a Criminal History Category of I. The resulting United States Sentencing Guidelines ("Guidelines") range was 97 to 121 months. Taking into consideration Cortes's lack of prior criminal activity, the district court sentenced Cortes to 97 months in prison.

Cortes appeals the district court's determination that the federal carjacking statute represents a valid exercise of congressional lawmaking authority as well as its refusal to adjust his sentence downward for an acceptance of responsibility.

## DISCUSSION

### I. CONSTITUTIONALITY OF 18 U.S.C. § 2119

#### A. Standard of Review

We review de novo a district court's denial of a motion to dismiss. *United States v. Nguyen*, 88 F.3d 812, 820 (9th Cir.1996). We also review de novo a district court's determination of the constitutionality of a federal statute. *United States v. Jones*, 231 F.3d 508, 513 (9th Cir.2000).

#### B. Commerce Clause Authority

■ Cortes was convicted under 18 U.S.C. § 2119 which provides:

> Whoever with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall be ... imprisoned.

Congress enacted this statute pursuant to the Commerce Clause, which allows Congress "to regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. Cortes argues that Congress exceeded its Commerce Clause authority by enacting a statute to govern carjacking—a purely local offense, having nothing whatsoever to do with interstate commerce. To support his contention, Cortes relies upon the Supreme Court's recent decisions in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); and *Jones v. United States*, 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000).

In *Lopez*, the Supreme Court assessed the constitutionality of the Gun–Free School Zones Act of 1990, 18 U.S.C.

§ 922(q)(1)(A), which made it a federal crime "for any individual knowingly to possess a firearm at a place that the individual knows ... is a school zone." 514 U.S. at 551, 115 S.Ct. 1624 (citation omitted). After extensively surveying the history of Commerce Clause jurisprudence, the Court identified three broad categories of activity that Congress may regulate: (1) "the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and (3) "those activities having a substantial relation to interstate commerce, *i.e.,* those activities that substantially affect interstate commerce." *Id.* at 558–59, 115 S.Ct. 1624 (citation omitted). The relevant category in *Lopez* was Congress's ability to regulate gun possession as an activity that substantially affects interstate commerce. The Court noted that the gun possession statute was not limited to any "discrete set of firearm possessions ... [with] an explicit connection with or effect on interstate commerce." *Id.* at 562, 115 S.Ct. 1624. It "contain[ed] no jurisdictional element which would ensure, through a case-by-case inquiry, that the [conduct] in question affect[ed] interstate commerce."[1] *Id.* at 561, 115 S.Ct. 1624. Nor was the gun possession statute defensible as "an essential part of a larger regulation of economic activity." *Id.* at 561, 115 S.Ct. 1624.

In addition, the Court noted that Congress made no legislative findings when enacting the Gun Free School Zones Act. *Id.* at 563, 115 S.Ct. 1624. Although congressional findings are not normally necessary, they would have enabled the Court to "evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye." *Id.*

The Supreme Court concluded that the gun possession statute was merely "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise." *Id.* at 561, 115 S.Ct. 1624. The statute neither regulated a commercial activity nor contained a requirement that the gun possession be connected in any way to interstate commerce. Thus, the Court invalidated the statute as beyond Congress's Commerce Clause authority. *Id.*

Despite the Commerce Clause watershed wrought by *Lopez,* the Circuits, including our own, have unanimously upheld the federal carjacking statute against Commerce Clause challenges. *See United States v. Rivera–Figueroa,* 149 F.3d 1, 3–4 (1st Cir.1998); *United States v. Cobb,* 144 F.3d 319, 321 (4th Cir.1998); *United States v. Romero,* 122 F.3d 1334, 1339 (10th Cir. 1997); *United States v. McHenry,* 97 F.3d 125, 126–27 (6th Cir.1996); *United States v. Coleman,* 78 F.3d 154, 157–60 (5th Cir. 1996); *United States v. Hutchinson,* 75 F.3d 626, 627 (11th Cir.1996); *United States v. Bishop,* 66 F.3d 569, 576–83 (3d Cir.1995); *United States v. Robinson,* 62 F.3d 234, 236 (8th Cir.1995); *United States v. Oliver,* 60 F.3d 547, 549–50 (9th Cir. 1995). These decisions conclude that the

---

1. A statute with an express jurisdictional element, former 18 U.S.C. § 1202(a), made it a crime for a felon to "receive, posses[s], or transport in commerce or affecting commerce ... any firearm." *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). In *Bass,* the Court read the "in commerce or affecting commerce" jurisdictional element to apply to all three antecedent offenses; thus avoiding the question whether Congress could constitutionally punish the "mere possession" of firearms. *Id.* at 339 n. 4, 347, 92 S.Ct. 515. In *Lopez,* the Court strongly implied that § 1202(a)'s jurisdictional element immunized it from successful constitutional challenge. *Lopez,* 514 U.S. at 561–62, 115 S.Ct. 1624.

carjacking statute is constitutional, justified by carjacking's substantial effect on interstate commerce or as a regulation of an instrumentality of interstate commerce. After these decisions, however, the Supreme Court decided *Morrison* and *Jones* which, Cortes argues, cast doubt on the precedential value of these cases.

In *Morrison*, the Court invalidated § 40302 of the Violence Against Women's Act ("VAWA"), 42 U.S.C. § 13981, which created federal civil liability for the commission of a gender motivated crime. As in *Lopez*, the Court found important that gender-motivated crime was not economic in nature. *Morrison*, 529 U.S. at 610–11, 120 S.Ct. 1740. Moreover, § 40302 contained no express jurisdictional element which would limit its reach to a discrete set of gender motivated violence cases that had an explicit connection with or effect on interstate commerce. *Id.* at 613, 120 S.Ct. 1740.

Unlike the statute in *Lopez*, however, VAWA was supported by congressional findings regarding the "serious impact that gender-motivated violence has on victims and their families." *Id.* at 614, 120 S.Ct. 1740. Congress found that gender-motivated violence affected interstate commerce " 'by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce ... by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products.' " *Id.* at 615, 120 S.Ct. 1740 (quoting H.R. Conf. Rep. No. 103–711, at 385 (1994)).

Showing no deference to these congressional findings, the Court repudiated Congress's attempt "to follow the but-for causal chain from the initial occurrence of violent crime ... to every attenuated effect upon interstate commerce." *Id.* The costs of violent crime identified by Congress insufficiently connected gender-motivated violence to interstate commerce. Absent some showing that such violence substantially affected interstate commerce in a more direct manner, the Court concluded Congress could not regulate it pursuant to the Commerce Clause.

In *Jones*, the Court similarly approached the constitutionality of the federal arson statute, which made it a federal crime to damage "by means of fire or an explosive ... property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i). Jones claimed that firebombing an owner-occupied, private residence did not fall within the ambit of the statute because the residence was not "used in" any activity affecting interstate commerce. *Jones*, 529 U.S. at 850, 120 S.Ct. 1904. The government urged that the private residence was "used in" three activities "affecting commerce." *Id.* at 854, 120 S.Ct. 1904. The homeowner (1) mortgaged and (2) insured the property through out-of-state entities, and (3) the home received natural gas from interstate sources. *Id.* at 855, 120 S.Ct. 1904.

The Court noted that "[p]ractically every building in our cities, towns, and rural areas is constructed with supplies that have moved in interstate commerce, served by utilities that have an interstate connection, financed or insured by enterprises that do business across state lines, or bear some other trace of interstate commerce." *Id.* at 857, 120 S.Ct. 1904. Rather than expose every "building in the land" to the wrath of the arson statute, however, the Court narrowly interpreted the jurisdictional element to encompass only property actively employed for commercial purposes; a "passive, passing, or past connection" to interstate commerce was not sufficient. *Id.* at 855, 120 S.Ct.

1904. By construing the arson statute narrowly, the Court said it was avoiding the constitutional question that would arise from reading the statute to reach any residence with such an attenuated connection with interstate commerce. *Id.* at 858, 120 S.Ct. 1904.

Cortes argues that the intervening decisions in *Morrison* and *Jones* compel us to invalidate the federal carjacking statute and, consequently, to repudiate our former decision in *Oliver.* We consider this issue as the parties frame it: whether pursuant to the Commerce Clause, Congress may regulate carjacking as an activity that substantially affects interstate commerce. Following the rubric outlined in *Lopez, Morrison,* and *Jones,* we hold that carjacking is an activity that substantially affects interstate commerce, and therefore, Congress may regulate it.

## C. Carjacking Is an Economic Activity Affecting Interstate Commerce

At bottom, the statutes in *Lopez* and *Morrison* were criminal statutes having nothing to do with commerce or any sort of economic enterprise. Congress rationalized its Commerce Clause authority to enact the Gun–Free School Zones Act and VAWA based solely on the notion that violent crime generally impacts employment, production, transit, and consumption, and thereby substantially affects interstate commerce. The Supreme Court, however, condemned the idea that Congress could rely on such generalized "costs of crime" for the power to regulate "not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." *Lopez,* 514 U.S. at 564, 115 S.Ct. 1624. The Court required a closer nexus between the criminalized conduct and interstate commerce.

Here, by contrast, the carjacking statute criminalizes illegal activity that directly af-

fects interstate commerce. At the outset, we note that unlike the statutes in *Lopez* and *Morrison,* the carjacking statute was enacted as "an essential part of a larger regulation of economic activity." *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624. Specifically, it was the lead provision in the Anti Car Theft Act of 1992, Pub.L. No. 102–519 (the "Act"). The Act struck at the burgeoning interstate trade in stolen vehicles and parts. In addition to making carjacking a federal crime, the Act increased penalties for importing and exporting stolen cars; criminalized the operation of chop shops; provided federal funds for anti-car theft organizations; developed a national system for combating title fraud; and increased inspection at border checkpoints.

Congress also made extensive findings that auto theft and carjacking, in particular, substantially affects interstate commerce. Congress found that "automobile theft has become a large and lucrative business" "peopled by professional criminals operating as part of profit-making enterprises." H. Rep. No. 102–851I (1992) (*reprinted in* 1992 U.S.C.C.A.N. 2829, 2830). In fact, "automobile theft has become the nation's number one property crime problem." U.S.C.C.A.N. at 2830. More than 1.6 million motor vehicles were reported stolen in 1991, an increase of 34% since 1986. *Id.* Those vehicles were worth an estimated $8–9 billion, representing over 50% of the value of property lost to crime. *Id.*

Once carjacked, the vehicle is Gone In 60 Seconds. Automobile thieves bring a stolen car to a chop shop where it is systematically dismembered. Chop shops then sell the severed parts in interstate and international commerce. *Id.* at 2831. Because a car's parts may be worth more than four times the value of the car, such an enterprise generates enormous profit. *Id.* at 2830. Car thieves also make money

by "washing" the title and selling the stolen car to an unsuspecting buyer or by exporting the stolen vehicles for sale abroad. *Id.* at 2830–31. "Enterprises using all three profiteering methods regularly engage in interstate, and even international trafficking of automobile parts." *Id.* at 2831.

We are not bound by Congress's findings concerning carjacking's effect on interstate commerce. As the Supreme Court observed "[s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not make it so." *Morrison,* 529 U.S. at 614, 120 S.Ct. 1740. Rather, whether a particular activity affects interstate commerce sufficiently to come under the constitutional power of Congress to regulate it is ultimately a judicial rather than a legislative question. *Lopez,* 514 U.S. at 557 n. 2, 115 S.Ct. 1624 (quoting *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 273, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (Black, J., concurring)).

In this case, however, we credit Congress's extensive findings which demonstrate exactly how carjacking, as a criminal enterprise, directly and substantially affects interstate commerce. Absent from Congress's findings are the attenuated and inchoate costs of crime condemned in *Lopez* and *Morrison.* Indeed, to make the connection between carjacking and interstate commerce, we need not "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez,* 514 U.S. at 567, 115 S.Ct. 1624. Instead, Congress transparently demonstrated that carjacking substantially affects the interstate commerce markets in automobiles, automobile parts, and automobile insurance.

We find no inconsistency between our decision today and *United States v. Lynch,*

265 F.3d 758, 762–64 (9th Cir.2001). In *Lynch,* we considered the proper construction of the jurisdictional element found in the Hobbs Act. Using reasoning analogous to that found in *Jones,* we required a direct and active nexus between each instance of robbery of an individual and interstate commerce.

Here, we decide whether a class of activity, *i.e.,* carjacking, substantially affects interstate commerce such that Congress may regulate it. Our inquiry closely parallels the Supreme Court's inquiries in *Lopez* and *Morrison:* whether Congress could regulate certain gun possessions or gender-motivated crimes. Because we decide that carjacking does substantially affect interstate commerce, Congress may regulate it in its entirety. That a particular instance of carjacking may have a *de minimis* effect on interstate commerce is of no consequence. *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624 (citing *Maryland v. Wirtz,* 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)).

That the carjacking statute contains an express jurisdictional element which limits its reach to vehicles that have been "transported, shipped, or received in interstate or foreign commerce" reinforces our conviction that the carjackings targeted by 18 U.S.C. § 2119 substantially affect interstate commerce. As *Lopez* recognized, such jurisdictional elements "ensure, through case-by-case inquiry that the[criminalized conduct] in question affects interstate commerce." 514 U.S. at 561, 115 S.Ct. 1624. Cortes contends, however, that this particular jurisdictional element does not have a sufficiently close nexus with active interstate commerce, as it encompasses every car in the land based solely on past interstate activity.

Addressing a nearly identical jurisdictional element in *Scarborough v. United States,* the Supreme Court considered

whether proof that an illegally possessed firearm previously traveled in interstate commerce was sufficient to satisfy the nexus between possession of the firearm and commerce.[2] 431 U.S. 563, 564, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977). The Court answered affirmatively; if the government proved that Scarborough's firearms had at some time traveled in interstate commerce, a sufficiently close nexus between possession of the firearms and commerce was established.[3]

■ We employ that same reasoning to conclude that carjackings targeted by 28 U.S.C. § 2119 substantially affect interstate commerce. If the vehicle in question was "transported, shipped, or received," at some point in interstate commerce, a sufficiently close nexus between the vehicle and interstate commerce is established, and the carjacking statute applies. As *Scarborough* holds, such a jurisdictional element provides the necessary connection between each instance of carjacking covered by the statute and interstate commerce. When the government introduced the parties' stipulation that the "blue 1996 Oldsmobile ... which was driven by Special Agent Whitman ... was manufactured in Kansas City, Kansas, in 1996, and was transported to the [FBI] in Los Angeles, California," the government sufficiently tied this particular carjacking to interstate commerce. No greater nexus between the

carjacking and interstate commerce was required.

Taken together, the legislative context of the carjacking statute, Congress's extensive findings, and the statute's jurisdictional element ensure that carjackings covered by 28 U.S.C. § 2119 substantially affect interstate commerce. Accordingly, Congress may constitutionally regulate carjacking pursuant to the Commerce Clause. By the bye, the Seventh and Tenth Circuits agree with our conclusion, or perhaps, we agree with theirs. *See United States v. Garcia,* 2001 WL 1632546, (10th Cir.2001) (unpublished)2001 U.S.App. LEXIS 26986, at *3 ; *United States v. Taylor,* 226 F.3d 593, 597–600 (7th Cir.2000).

## II ACCEPTANCE OF RESPONSIBILITY ADJUSTMENT

### A. Standard of Review

■ We review for clear error a district court's factual determination whether to reduce a defendant's sentence based on acceptance of responsibility. *United States v. Villasenor–Cesar,* 114 F.3d 970, 973 (9th Cir.1997). We review de novo whether the district court misapprehended the law with respect to the acceptance of responsibility reduction. *United States v. Hock,* 172 F.3d 676, 681 (9th Cir.1999).

---

2. The vitality of *Scarborough* engenders significant debate. *See United States v. Hanna,* 55 F.3d 1456, 1462 (9th Cir.1995) (following *Scarborough* after *Lopez* ); *United States v. Coward,* 151 F.Supp.2d 544, 554–55 (E.D.Pa. 2001) (adhering to *Scarborough* but doubting its continued vitality and expecting reversal); *see also* Brent E. Newton, *Felons, Firearms, and Federalism: Reconsidering* Scarborough *in Light of* Lopez, 3 J.App. Prac. & Process 671, 683–84 (2001) (doubting whether *Scarborough* remains good law after *Lopez* ). Until the Supreme Court tells us otherwise, however, we follow *Scarborough* unwaveringly.

3. Since *Morrison* and *Jones,* we have upheld statutes proscribing certain gun possessions because those statutes contain an "express jurisdictional element that demonstrates the necessary nexus between the statutory provision and interstate commerce." *United States v. Jones,* 231 F.3d 508, 514 (9th Cir.2000) (upholding 18 U.S.C. § 922(g)(8), which proscribes firearm possession by a person subject to a domestic violence protection order); *see also United States v. Davis,* 242 F.3d 1162, 1162–63 (9th Cir.2001) (upholding 18 U.S.C. § 922(g)(1) which proscribes firearm possession by a convicted felon).

## B. Application

Cortes was entitled to a reduction for acceptance of responsibility "if [he] clearly demonstrate[d] acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). The plain language of § 3E1.1 places the burden on Cortes to show he is deserving of the reduction. To meet that burden, Cortes must "manifest[ ] a genuine acceptance of responsibility for his actions." *United States v. McKinney*, 15 F.3d 849, 852 (9th Cir.1994). If Cortes's statements and conduct made it clear that his contrition was sincere, he was entitled to the reduction. *See United States v. Hill*, 953 F.2d 452, 461 (9th Cir.1991) (upholding acceptance of responsibility reduction where defendant was sincerely remorseful even though his expressions of remorse came at the "eleventh hour"—his sentencing hearing).

█ If Cortes manifested appropriate contrition, exercise of his constitutionally protected rights cannot be held against him. *See United States v. Vance*, 62 F.3d 1152, 1157 (9th Cir.1995). In particular, Cortes was not required to forego his right to a trial by jury and plead guilty in order to receive the acceptance of responsibility reduction. Although a guilty plea is undoubtedly significant evidence of an acceptance of responsibility, if Cortes otherwise demonstrated sincere contrition, he remains eligible for the reduction.

The application notes interpreting § 3E1.1 provide that "a defendant may clearly demonstrate an acceptance of responsibility ... even though he exercises his constitutional right to a trial." This situation "may occur where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id.* Though this passage lists only two circumstances where the acceptance of responsibility reduction

may apply despite a defendant proceeding to trial, it was not intended to be an exhaustive list. *See McKinney*, 15 F.3d at 852. We have held in several instances that even "a defendant who contests his factual guilt may ... be entitled to [the § 3E1.1] adjustment." *United States v. Mohrbacher*, 182 F.3d 1041, 1042 (9th Cir. 1999); *see also McKinney*, 15 F.3d at 853 ("[T]he reduction is also available ... [where] the defendant manifests genuine contrition for his acts but nonetheless contests his factual guilt at trial.").

In *United States v. Ochoa–Gaytan*, 265 F.3d 837, 842 (9th Cir.2001), the district court denied the reduction because the defendant proceeded to trial. The district court believed that pressing the case to trial foreclosed the availability of the reduction as a matter of law. *Id.* At sentencing the district court stated:

> There's no factual dispute, really, that at the time of his arrest, he did admit that his status and—but the problem is, is that since he was brought into the court system, he's moved to suppress his statements. *He went to trial. The issue was factual guilt. It wasn't to protect or preserve some constitutional issues. . . . .* I don't see how 3E1.1 acceptance applies. *. . . . Legally, I do not believe in any way that this adjustment applies on this kind of case . . . .*

*Ochoa–Gaytan*, 265 F.3d at 842 (emphases added). We reversed, holding that "a defendant's choice to exercise the constitutional right to trial and thus, to hold the government to its burden—even where the defendant does not bring a constitutional challenge—does not automatically make the defendant ineligible for the [§ 3E1.1] adjustment." *Id.* at 843. We observed that § 3E1.1's first application note provided a non-exhaustive list of factors—other than a guilty plea—which a sentencing court should consider in determining

whether a defendant manifested acceptance of responsibility. A defendant who went to trial in order to put the government to its burden could satisfy every consideration listed.

On the record before us, it is unclear whether the district court, like the district court in *Ochoa–Gaytan*, assumed that an acceptance of responsibility reduction was unavailable to Cortes because he went to trial to contest an issue related to factual guilt. Reminiscent of the district court's statements in *Ochoa–Gaytan*, the district court stated:

> In terms of acceptance of responsibility, I also find that's a legal issue, and that the defendant in putting into question, and determination by the jury, the issue of ... specific intent, it did put an issue of element of the crime, not a constitutional issue [sic]. And this Court does not believe it is appropriate to award him any points for acceptance of responsibility.

The district court spoke nary another word about Cortes's acceptance of responsibility. It made no specific findings concerning Cortes's remorse or contrition, and it did not consider on the record the applicable Guideline factors. It appears the district court may have believed, as a matter of law, that Cortes was ineligible for the reduction. Employing that type of per se bar to the acceptance of responsibility reduction would have impermissibly penalized Cortes for exercising his constitutional rights. It is also possible, of course, that the district court *sub silentio* appropriately balanced all the relevant factors and still denied Cortes the requested reduction. On this record, however, that analysis is entirely lacking, and thus remand is appropriate to allow the district court to fully explicate the issue in the first instance. *See United States v. Sitton*, 968 F.2d 947, 962 (9th Cir.1992) (remanding where it was unclear if the district court denied an acceptance of responsibility reduction based on defendant's exercise of a constitutional right to suppress evidence). We express no opinion on the merits of Cortes's request for an acceptance of responsibility reduction.

## CONCLUSION

Carjacking substantially affects interstate commerce, and thus, the district court correctly determined that Congress may regulate it pursuant to its Commerce Clause authority. Cortes's sentence is vacated so the district court can consider the appropriate factors related to the acceptance of responsibility reduction.

AFFIRMED in part, VACATED, and REMANDED.