# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

v.

JAY W. WILSON,
      *Defendant-Appellant.*

No. 03-30089

D.C. No.
CR-01-00263-HJF

ORDER
AMENDING
OPINION AND
DENYING THE
PETITION FOR
REHEARING AND
PETITION FOR
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Helen J. Frye, District Judge, Presiding

Argued and Submitted
November 1, 2004—Portland, Oregon

Filed December 23, 2004
Amended February 4, 2005

Before: Warren J. Ferguson, Stephen S. Trott, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Trott

1523

**COUNSEL**

Jane E. Ellis, Portland, Oregon, for the defendant-appellant.

Charles W. Stuckey, Assistant U.S. Attorney, Portland, Oregon, for the plaintiff-appellee.

**ORDER**

The Opinion filed December 23, 2004, slip op. 17189, and appearing at 392 F.3d 1055 (9th Cir. 2004), is amended by removing the last three sentences in footnote #1 as follows:

> Wilson claims in this appeal that the district court erred when it determined that Wilson was not entitled to a downward adjustment for a minor role in the offense under U.S.S.G. § 3B1.2. This contention does not merit lengthy discussion, and reviewing for clear error, we affirm the district court's determination that Wilson was not entitled to a minor role adjustment. ~~We have "consistently stated that a downward adjustment under section 3B1.2 is to be used infrequently and only in exceptional circumstances." *United States v. Davis*, 36 F.3d 1424, 1436 (9th Cir. 1994) (citing *United States v. Hoac*, 990~~

~~F.2d 1099, 1106 (9th Cir. 1993)). Given that Wilson was involved in every aspect and at every level of the conspiracy, this is not one of those exceptional circumstances.~~

So it reads:

> Wilson claims in this appeal that the district court erred when it determined that Wilson was not entitled to a downward adjustment for a minor role in the offense under U.S.S.G. § 3B1.2. This contention does not merit lengthy discussion, and reviewing for clear error, we affirm the district court's determination that Wilson was not entitled to a minor role adjustment.

With this amendment, the panel as constituted above has voted to deny the petition for rehearing. Judges Trott and Kleinfeld have voted to deny the petition for rehearing en banc, and Judge Ferguson so recommends.

The full court has been advised of the suggestion for rehearing en banc and no judge of the court has requested a vote on it. Fed. R. App. P. 35(b).

The petition for rehearing and the petition for rehearing en banc are DENIED.

No further requests for petition for rehearing or petition for rehearing en banc shall be entertained.

---

## OPINION

TROTT, Circuit Judge:

Jay Wilson appeals his conviction and sentence in the federal district court for drug charges related to a conspiracy to

import, distribute, and possess MDMA (ecstasy). The district court rejected, prior to trial, Wilson's claim that the government had promised him complete immunity in return for his cooperation in dismantling the international conspiracy in which he was involved; and at his sentencing, the court denied him credit for acceptance of responsibility. Because the district court's rulings were free of error, we affirm both Wilson's conviction and his sentence.[1]

## BACKGROUND

The drug conspiracy for which Wilson was convicted came to the attention of the government in May of 2001, when United States Customs agents in Florida discovered that a box of shampoo bottles arriving from Belgium actually contained hundreds of pills. Investigation revealed that the pills were ecstasy and had been shipped by a main player in the conspiracy, Terrance Fischer.

A task force comprised of agents from various law enforcement agencies delivered the intercepted package to its original addressee, the Tan Machine, a tanning salon in Portland, Oregon, a frequent shipping destination in this conspiracy. The business owner agreed to cooperate with investigators, and he told them that a man named Andre Wegner was scheduled to pick up the package at a storage locker in Portland. Wegner, however, sent Chad Bring to pick up the package. Bring was arrested, and he told investigators about several associates in the drug conspiracy, including Wilson.

During the investigation that followed, agents discovered

---

[1] Wilson claims in this appeal that the district court erred when it determined that Wilson was not entitled to a downward adjustment for a minor role in the offense under U.S.S.G. § 3B1.2. This contention does not merit lengthy discussion, and reviewing for clear error, we affirm the district court's determination that Wilson was not entitled to a minor role adjustment.

detailed evidence that placed Wilson in the middle of the conspiracy. Agents discovered that Fischer and Wilson had been close associates for some time prior to the intercepted shipment. When Fischer moved to Amsterdam in January of 2001, Wilson personally helped him rent an apartment and set up a bank account and operations. Fischer shipped load after load of ecstasy pills to the United States, and Wilson bought, sold, and distributed them.

Investigation revealed also that the conspiracy stretched across the country. Wilson distributed ecstasy to others nationwide, selling it at a retail level as well. At one point, Wilson spent more than $20,000 to charter a Lear jet to fly drugs and money across the country. At trial, however, Wilson testified that Fischer and Wegner gave him the money to charter the jet, but did not know that drugs were in the airplane.

Wilson rented a storage locker for the purpose of storing the drugs. When the conspiracy began to unravel and some co-conspirators were arrested, Wilson, in a last ditch effort to shift the operations and avoid detection, cleaned out the storage locker and opened a mailbox in Salem, Oregon. At trial, Wilson conceded that using the mailbox to assist the drug operation was wrong, but he claimed that he had a friend rent it for him — not so that Wilson could do "anything illegal," — but to communicate with Fischer about the situation in the United States. According to Wilson, Fischer would send to him $1,000 for each container of ecstasy shipped in return for information. The mailbox, however, was used to receive drug shipments from Europe, which Wilson admitted.

Wilson's attempts to avoid detection failed. On August 13, 2001, agents armed with a search warrant stopped Wilson about a mile from his house, read him *Miranda*[2] warnings, explained that they had a warrant to search his house, and

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

took Wilson to his abode. There, after obtaining Wilson's consent to search, they searched Wilson's person, his house, and his car.

During the search, agents questioned Wilson about the conspiracy, telling him that they wanted his cooperation to expand the investigation, that they did not think he was the "biggest player," and that they "didn't want him." Agents asked Wilson about his relationship with Fischer, as well as his connection to Wegner and the storage locker. Wilson freely admitted to some of his involvement, explaining how he knew Fischer and Wegner, admitting he had been involved in some drug transactions, and admitting he had rented the storage unit. Wilson, however, refused to answer certain questions about past sales and possession of drugs, saying that he did not want to incriminate himself. During the search and questioning, agents told Wilson that 100 ecstasy pills had been found in his briefcase that was in his car. Wilson denied that he had any pills, saying "I haven't had a large quantity of pills in months," and he then asserted his right to counsel.

About twenty minutes after Wilson had asserted his right to counsel, Wilson approached Agent Alexander, an agent from the Drug Enforcement Administration, and asked if he could speak with Alexander in private.[3] Wilson told Alexander and Detective Williams, who was also working on the case, that there was a two-day window of opportunity to receive a shipment of ecstasy from Europe and that if Wilson did not make or receive a phone call, the window would close forever. Wilson then gave agents more detailed information about Fischer and Wegner and agreed to cooperate with the agents. In response to Wilson's willingness to cooperate, agents told Wilson that his help would be brought to the attention of the prosecutor. However, they informed him that the prosecutor who had authority to negotiate a deal with him was out of

---

[3]In this appeal, Wilson does not claim that his rights under *Miranda* were violated.

town. Furthermore, they explained that it would be up to that prosecutor, not the agents, to negotiate any deal with him.

The next day, the agents delivered telephone recording equipment to Wilson's house. Fischer called Wilson to confirm the drug shipment, and thereafter, Wilson helped law enforcement intercept several shipments of ecstasy from Europe. While Wilson was assisting the agents, he secretly recorded his conversations with them.

Wilson's tape-recorded conversations and the testimony of both Wilson and the agents established that Wilson broached the topic of immunity several times during the course of the investigation, expressing concern that he was taking risks by cooperating. The recordings and testimony revealed also that agents repeatedly told Wilson that they were powerless to grant him immunity. Agent Blanchard testified, for example, that he explained the prosecutor's options — the prosecutor could decide not to charge Wilson with some crimes, or could "throw the book at him." Blanchard testified also that agents repeatedly informed Wilson it was not up to them whether he was granted any immunity. Moreover, in one recorded conversation, after Wilson told agents that he would go no further without immunity, Agent Blanchard said, "I sure in hell can't grant you immunity and you know that. We explained all of this. A criminal act took place before you started working with us."

In yet another recorded conversation, Agent Blanchard told Wilson, "If you are charged with anything it's all going to be stuff that went on before you know[,] this part of the thing." Wilson responded, "I understand that and that I'm not being charged with anything I'm doing in order to help you guys." Wilson expressed hope that his earlier conduct would be forgiven as well, to which Agent Blanchard responded, "That is obviously something that you can negotiate with the prosecutors. I'd go ahead and mention it."

About two weeks after Wilson began assisting the agents, the prosecutor in charge of Wilson's case returned from vacation, and he met with Wilson and his attorney. At that meeting, the prosecutor acknowledged Wilson's cooperation and offered him a plea agreement that would include a six-year sentence — a generous offer that would have greatly reduced the duration of Wilson's possible sentence. Wilson demanded complete immunity and refused to accept the deal. As a result, Wilson was tried, convicted of all but one count, and sentenced to twenty years imprisonment.

## DISCUSSION

### A.  Immunity

#### 1.  Standard of Review

Because this is a claimed immunity agreement, ordinary contract principles apply. *United States v. Plummer*, 941 F.2d 799, 802-03 (9th Cir. 1991). Therefore, we review the trial court's factual determinations for clear error. *Id.* at 803. We review determinations relating to formation of an enforceable agreement also for clear error. *See Collins v. Thompson*, 679 F.2d 168, 170 (9th Cir. 1982) ("[d]eterminations of contract matters regarding offer, rejection, and revocation utilizing the objective standard are factual" and are upheld unless clearly erroneous).

#### 2.  Existence of an Agreement

Wilson claims that he is entitled to full immunity because the agents' conduct and statements created an informal immunity agreement. The government responds that no agreement was ever formed because no one ever offered Wilson immunity.

To support his claim that an offer was made, Wilson points to various statements agents made to him regarding his role

in the conspiracy. He was told "we don't think you're the biggest player in this"; "you are just a flyspeck in all of this"; "we don't want you, we just want to take this to the next level"; and "you did a good job." Wilson claims that these statements led him to believe he would be granted immunity. This argument fails for two reasons.

**[1]** First, whether Wilson honestly thought he would be granted immunity does not change the character of the agents' statements. In other words, whatever Wilson may have believed he would be granted, the statements to which Wilson points do not objectively reflect words of offer. *See United States v. Sophie*, 900 F.2d 1064, 1071 (7th Cir. 1990) (concluding that the defendant could not reasonably believe that promises of immunity had been made when the prosecutor said he would "*see what we can do*."); *Restatement (second) of Contracts* § 24 (1981) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.").

**[2]** Agents repeatedly told Wilson that the agents lacked authority to grant immunity. We do not doubt that Wilson's active cooperation could have provided the necessary acceptance and consideration had an offer of immunity in exchange for his cooperation ever been made. *See Restatement (Second) of Contracts* § 50 (2) (1981) ("Acceptance by performance requires that at least part of what the offer requests be performed or tendered and includes acceptance by a performance which operates as a return promise."). But the fatal flaw in Wilson's claim is elementary — no contract exists without an offer.

The Seventh Circuit faced a set of facts strikingly similar to Wilson's case in *Sophie*. 900 F.2d 1064. There, the defendant claimed that the prosecutor agreed any information the defendant gave would not be used against him and that the prosecutor would recommend a reduced sentence. The defen-

dant claimed that the prosecutor made statements such as, "In exchange for your complete candor . . . *I'll see what we can do. . . .*" *Id.* at 1071 (alteration in original). Moreover, the prosecutor told the defendant "*I cannot promise anything to you* but I'll see what can be done in light of your cooperation and candor, *but I cannot promise you, of course.*" *Id.* Examining the circumstances under ordinary contract principles, the Seventh Circuit concluded that the defendant could not have reasonably thought that these statements amounted to an offer or promise of immunity. *Id.* at 1071-72.

**[3]** As in *Sophie*, Wilson can point to no statement in which anyone offered or promised him immunity. In fact, *Sophie* was a much closer case. The language the prosecutor used in *Sophie* at least resembled words of offer, though words ultimately not concrete enough to constitute one. Telling Wilson that he was a small player in a group of conspirators does not even come close. Moreover, in *Sophie*, no one unequivocally told the defendant that he had, in fact, not been granted immunity. In sharp contrast, Wilson was repeatedly and indisputably told that the agents were powerless to grant it. Agent Blanchard announced, "I sure in hell can't grant you immunity and you know that."

**[4]** Second, to the extent Wilson claims that he subjectively believed that he had been granted immunity, the district court found Wilson's testimony not credible, for good reason: Wilson's claim that the agents led him to believe that he would be granted immunity ignores his own statements that demonstrate he knew no one had granted it. When told that he would be charged, if at all, with the crimes he committed before he began to assist the police, he told agents "I understand." During the course of his cooperation, Wilson told agents that he would not continue to help until he was granted immunity. He expressed his concern to agents that he was "taking a risk" by cooperating and should be granted immunity for all of his conduct. Agents responded that Wilson should certainly bring that point up with the prosecutor. Wilson's repeated requests

for immunity were a product of his knowledge that no one had granted it. Whatever hopes Wilson had for complete immunity simply never materialized.

## B.   Acceptance of Responsibility

### 1.   Standard of Review

The district court's determination of whether a defendant has accepted responsibility is a factual determination we review for clear error. *United States v. Scrivener*, 189 F.3d 944, 947 (9th Cir. 1999). "In reviewing a district court's determination as to a defendant's acceptance of responsibility, we must afford the district court 'great deference' because of its 'unique position to evaluate a defendant's acceptance of responsibility.' " *United States v. Fellows*, 157 F.3d 1197, 1202 (9th Cir. 1998) (quoting *United States v. Casterline*, 103 F.3d 76, 79 (9th Cir. 1996); U.S.S.G. § 3E1.1, Application Note 5).

### 2.   No Clear Acceptance of Responsibility

[5] Wilson's sentencing was governed by the United States Sentencing Guidelines. Under the guidelines, a defendant is entitled to a downward adjustment if he clearly accepts responsibility for all of his relevant conduct. *United States v. Ginn*, 87 F.3d 367, 370 (1996) ("a defendant is not entitled to an adjustment when he does not accept responsibility for all of the counts of which he is convicted"). If a defendant's statements and conduct make it clear that his contrition is sincere, he is entitled to a reduction. *United States v. Cortes*, 299 F.3d 1030, 1038 (9th Cir. 2002).

In finding that Wilson had not clearly accepted responsibility, the district court stated that Wilson "consistently manipulated facts specifically intended by the defendant to minimize his own involvement. The defendant's insincere attempts to cooperate with the government did not 'clearly demonstrate

acceptance of responsibility.' " The district court's findings are fully supported by the record, and the court's determination that Wilson did not clearly accept responsibility was far from clear error; it was entirely appropriate.

Wilson first points out that his going to trial does not preclude him from sincerely accepting responsibility after trial and thus being entitled to the adjustment. Without a doubt, a defendant may assert his right to trial and still be entitled to an acceptance of responsibility adjustment in rare circumstances. *Id.* at 1038-39. But the defendant faces a hurdle when he puts the government to its burden by contesting material factual matters. *See United States v. Bonanno*, 146 F.3d 502, 513 (7th Cir. 1998) (where the defendant challenged his guilt on some charges during trial, he "clearly failed to meet the burden of demonstrating a 'rare situation' where a party pleads not guilty and yet warrants reduction"). Wilson went to trial on every single count charged in the indictment and contested essential elements of his guilt. Consequently, his burden to demonstrate a clear acceptance of responsibility was high.

To be sure, some facts weighed in favor of a finding that Wilson accepted responsibility. Wilson admitted some, though not all, of his conduct to police when they searched his house, and he cooperated with police after he was caught. Wilson admitted to selling ecstasy. He conceded that he traveled to Europe to help Fischer, and he admitted to renting the storage locker and mailbox.

Nonetheless, four facts weighed heavily against a finding that Wilson clearly accepted responsibility for all of the relevant conduct: (1) his confessions were incomplete and vague; (2) his testimony was "not credible"; (3) he maintained his innocence during and after trial; and (4) his efforts to cooperate were all in a desperate attempt to secure complete immunity and to escape *all* of the consequences of his conduct.

**[6]** First, as to Wilson's confessions, Wilson was never completely forthcoming. For example, when Wilson admitted that he helped Fischer move to Europe, he maintained that he did not know why Fischer was moving there. Indeed, he claimed he had no intention of setting up drug operations with Fischer there because, at that time, Wilson thought Fischer was finished with the ecstasy business. Only later, Wilson testified, did he realize that he knew in his heart that Fischer would never get out of the drug business. Days after the move, however, Wilson was receiving shipments of drugs from Fischer. The record belies Wilson's claim of no knowledge of Fischer's activities.

Similarly, in describing his early actions in the conspiracy, Wilson testified, "Well, I was involved in early January of 2001 but probably not to the extent that they believe." In discussing one early transaction at a hotel, Wilson testified that he and Wegner went to the hotel room to sell ecstasy to a man named Scott Graber. According to Wilson, Wegner carried the backpack containing the pills, and Graber rented the hotel room. Wilson, while admitting that he knew a drug deal was happening, tried to minimize his role by admitting to no more than being the driver in that transaction. Graber's testimony was contrary — Wilson handed Graber the pills.

In connection with a different transaction involving Graber, Graber testified that Wilson sold him 500 pills. Wilson contested that fact at trial, claiming it had been 5, not 500 pills. When he testified about the Lear jet charter, Wilson claimed that he did not know he was transporting pills, only that he knew he was transporting drug money.

These incomplete admissions support the district court's finding that Wilson consistently attempted to minimize his involvement in the conspiracy. Such attempts to minimize and disclaim responsibility more than support the district court's determination that Wilson did not accept responsibility. *Scrivener*, 189 F.3d at 948 (where defendant attempted to falsely

minimize his role in the offense, the district court did not clearly err in denying an adjustment for acceptance of responsibility).

The district court's finding, however, is further supported by Wilson's unconvincing denial of guilt. Not only did Wilson attempt to minimize his role, but Wilson outright denied conduct for which he was convicted. He claimed at trial and afterward that the police planted 100 ecstasy pills in his briefcase. In fact, he "adamantly denied" that he had those 100 pills, and referred at trial to the pills as the ones "they had planted in my briefcase." The jury found otherwise, despite his adamant denials, and Wilson was convicted of this conduct.

**[7]** Second, in addition to minimizing his conduct and denying his guilt, Wilson offered trial testimony that the district court found not credible. As a result, the district court found, and we agree, that Wilson's testimony was far from a complete acceptance of responsibility. Rather, Wilson's testimony was a strained attempt to minimize his role in the conspiracy, put the government to its burden of proving factual allegations, and escape prosecution altogether. A defendant, such as Wilson, who takes the stand to claim his complete innocence of some of the charges and offers testimony on his behalf that is not credible does not accept responsibility for his conduct.

**[8]** Third, Wilson continued to assert his innocence after conviction for counts that involved shipments to the Tan Machine. Wilson was found guilty of those counts, yet he maintained his factual innocence during and after trial. At trial, Wilson testified, "I never had nothing to do with it. I have never been in The Tan Machine. . . . I have no knowledge of that; had no idea it was going on whatsoever." Even at sentencing (indeed, even in this appeal), despite a conviction on those counts, Wilson's counsel continued to argue that Wilson was not responsible for this conduct. Wilson certainly

may decide to challenge those counts, but to claim that he accepted responsibility for all of his conduct while simultaneously maintaining his innocence flies in the face of reason. *See United States v. Mohrbacher*, 182 F.3d 1041, 1052-53 (9th Cir. 1999) (where defendant refuses to admit all essential elements of guilt, a downward adjustment for acceptance of responsibility was properly denied). He has never admitted to this conduct for which he was convicted.

**[9]** Finally, the district court determined that Wilson's attempts to help law enforcement were not motivated by sincere contrition. This finding is manifestly reasonable; indeed, it seems Wilson's efforts were an attempt to secure immunity and to *avoid* taking responsibility for any of his conduct, not to accept responsibility for his behavior. Moreover, we have consistently held that where a defendant refuses to admit all of his guilt, his cooperation notwithstanding, a district court may properly deny a downward adjustment. *Id.*; *United States v. Dhingra*, 371 F.3d 557, 568 (9th Cir. 2004).

**[10]** In both *Mohrbacher* and *Dhingra*, the defendants cooperated extensively with authorities, and neither defendant presented any witnesses at trial. *Mohrbacher*, 182 F.3d at 1052; *Dhingra*, 371 F.3d at 568. In *Mohrbacher*, the defendant did not present any defense at trial. *Mohrbacher*, 182 F.3d at 1052. Nonetheless, because those defendants refused to admit to essential elements of guilt, we held that the denial of the downward adjustment was appropriate, despite their extensive cooperation with the authorities. *Mohrbacher*, 182 F.3d at 1052-53; *Dhingra*, 371 F.3d at 568. Not only did Wilson demand total immunity, he went to trial, contested material factual matters, and has continued to maintain his innocence on several counts. He has never admitted to all of his relevant conduct. Consequently, he failed to clearly accept responsibility despite his cooperation with authorities.

We note also that Wilson's cooperation did not go unnoticed, but he refused the fourteen-year reward that was handed

to him. As a result of his cooperation, the government offered Wilson a greatly reduced sentence of six years. Wilson refused to accept the offer, demanded complete immunity that the prosecutor would not give, went to trial, and bought himself a twenty-year sentence. His fate at the hands of the government was of his own choice.

## CONCLUSION

Because the district court correctly concluded that Wilson had no immunity agreement with the government, we affirm his conviction. We likewise affirm the sentence because Wilson failed to clearly accept responsibility for all of the conduct for which he was convicted.

**AFFIRMED.**