

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 14-10095 |
| Plaintiff-Appellee, | D.C. No. 2:10-cr-00391-JAM-6 |
| v. | |
| FAUSTO DIAZ-LOZANO, AKA Fausto Diaz, | MEMORANDUM* |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted December 13, 2016
San Francisco, California

Before: BERZON and MURGUIA, Circuit Judges, and BLOCK,** District Judge.

Fausto Diaz-Lozano appeals his conviction and sentence for several federal

drug crimes. We affirm Diaz-Lozano's conviction, upholding the district court's

denial of Diaz-Lozano's motion to suppress evidence and of an evidentiary hearing

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable Frederic Block, United States District Judge for the Eastern District of New York, sitting by designation.

*United States v. Diaz-Lozano*, No. 14-10095

Berzon, Circuit Judge, dissenting in part:

In my view, the district court clearly erred in finding the possession of firearms at the Gilroy stash house reasonably foreseeable to Diaz-Lozano, and so erred in applying a two-level upward adjustment under Guidelines section 2D1.1(b)(1).

"[T]he district court's factual determination of foreseeability 'must be supported by the particular facts and circumstances of the underlying [offense].'" *United States v. Sarkisian*, 197 F.3d 966, 990 (quoting *United States v. Zelaya*, 114 F.3d 869, 872 (9th Cir. 1997) (modification in original). In this case, unlike in other cases applying an upward adjustment for co-conspirator possession of a dangerous weapon, no specific facts indicate that Diaz-Lozano was or should have been aware of the possession of guns at the Gilroy stash house.

There is no evidence that Diaz-Lozano ever visited the Gilroy stash house.[1]

---

[1] When asked whether, during a July 14, 2010 conversation Diaz-Lozano had "describe[d] ever moving or transferring pounds of methamphetamine from this San Jose location himself to the Sacramento area?" undercover agent Salvador Robles answered "Yes." Asked to describe what Diaz-Lozano had said, Robles stated: "He told me that they had sent a vehicle to San Jose, and that vehicle had been loaded with ten pounds of meth and brought back to Sacramento in a hidden compartment." When then asked whether Diaz Lozano had stated "that he was part of this particular distribution, this ten-pound distribution," Robles again answered "Yes."

He did not have any contact with the three individuals arrested there. There is also no evidence that Diaz-Lozano knew any other individuals who spent time at the Gilroy house, let alone that he knew any such individuals well enough to know their "methods of operation." *See United States v. Willis*, 899 F.2d 873, 875 (9th Cir. 1990) (quoting *United States v. Douglas*, 780 F.2d 1472, 1476 (9th Cir. 1986)). Moreover, unlike in *United States v. Garcia*, 909 F.2d 1346, 1350 (9th Cir. 1990), in which the defendant was present with co-conspirators in a vehicle in which a gun was hidden during the relevant drug transaction, there is no evidence that weapons were ever present at any of the drug transactions in which Diaz-Lozano himself took part, or that Diaz-Lozano was ever otherwise in close proximity to weapons during the course of the conspiracy.

That drugs were delivered to Diaz-Lozano's house from a location where weapons were present, and that he had some knowledge of the scope of the overall drug conspiracy, is insufficient to support a finding of reasonable foreseeability. The application of the adjustment in this case amounts to an unwarranted "presumption as to the presence of a firearm in illicit narcotics transactions." *See Willis*, 899 F.2d at 875.

I therefore dissent as to the gun enhancement only. I concur in the remainder of the memorandum disposition.

on the motion to suppress. Due to a procedural error in calculating Diaz-Lozano's offense level, we vacate Diaz-Lozano's sentence and remand to the district court for resentencing.

1. Diaz-Lozano argues that the district court erred by denying his motion to suppress evidence obtained from warrantless GPS monitoring of his vehicle. In July 2010, when law enforcement personnel placed a GPS tracking device on Diaz-Lozano's vehicle, "circuit precedent held that placing an electronic tracking device on the undercarriage of a car was neither a search nor a seizure under the Fourth Amendment," and "that the government does not violate the Fourth Amendment when it uses an electronic tracking device to monitor the movements of a car along public roads." *United States v. Pineda-Moreno*, 688 F.3d 1087, 1090 (9th Cir. 2012) (citing *United States v. McIver*, 186 F.3d 1119, 1126–27 (9th Cir. 1999); *United States v. Hufford*, 539 F.2d 32, 34 (9th Cir. 1976); *United States v. Miroyan*, 577 F.2d 489, 492 (9th Cir. 1978)). After the warrantless monitoring here at issue, the United States Supreme Court held, in *United States v. Jones*, 132 S. Ct. 945 (2012), that the installation and use of a GPS tracking device on a suspect's vehicle is a Fourth Amendment search. Under *Jones*, placement and use of the GPS device on Diaz-Lozano's vehicle was unconstitutional. But we held in *United States v. Pineda-Moreno*, 688 F.3d 1087, 1090 (9th Cir. 2012), that

evidence derived from GPS monitoring before *Jones* is properly admitted at trial under the good faith exception to the exclusionary rule. *See Davis v. United States*, 564 U.S. 229, 239 (2011). As in *Pineda-Moreno*, the officers in this case reasonably relied on then-binding precedent, so the evidence obtained from the GPS monitoring is not subject to the exclusionary rule.

Diaz-Lozano's argument that *Pineda-Moreno* does not govern this case because a GPS device was used to track his movement from public roadways onto private property is unavailing. Although not discussed in *Pineda-Moreno*, the Supreme Court rejected the distinction Diaz-Lozano attempts to make in *United States v. Knotts*, 103 S. Ct. 1081 (1983). *Knotts* held that an individual traveling by public roadway has no expectation of privacy as to "the fact of his final destination when he exited from public roads onto private property." *Id.* at 1085. *Knotts* further held that there is no "expectation of privacy extended to the visual observation of [a suspect's] automobile arriving on his premises after leaving a public highway."

2. The district court's decision not to conduct an evidentiary hearing on the scope of GPS monitoring was not an abuse of discretion. *See United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). The government has unequivocally stated that it is not aware of the installation of any GPS or other surveillance

devices in the investigation of Diaz-Lozano apart from the device installed on July 6, 2010. Diaz-Lozano has not alleged facts to the contrary "with sufficient definiteness, clarity, and specificity" to demonstrate contested issues of fact warranting an evidentiary hearing. *See id*.

3. As to sentencing, we affirm the district court's decision with respect to the actual amount and purity of methamphetamine, Diaz-Lozano's ineligibility for an acceptance of responsibility reduction, and the foreseeability of firearms possessed by co-conspirators. The district court's finding that Diaz-Lozano played a managerial role such that he was eligible for a three-level upward adjustment was, however, clear error. Accordingly, we vacate and remand for resentencing.

a. The evidence in the record supports the district court's finding that five pounds of actual methamphetamine were involved in an April 19, 2010 drug transaction. The sentencing guidelines permit the district court to approximate the quantity of controlled substances at issue where "the amount seized does not reflect the scale of the offense." U.S.S.G. § 2D1.1 (2012) (cmt. 5).[1] Two intercepted phone conversations on April 19 between Diaz-Lozano and other individuals discussed a delivery of drugs planned for that day. The second call, with Joel Lara,

---

[1] All references to the United States Sentencing Guidelines ("U.S.S.G.") are to the 2012 version, which was in effect at the time of Diaz-Lozano's sentencing.

indicated that Lara was bringing "five shirts"[2] to Diaz-Lozano's house. About twenty-five minutes after the second call, two vehicles arrived at Diaz-Lozano's house. Surveillance teams observed Lara exiting one of the vehicles, accessing the trunk of the other vehicle, and then going into Diaz-Lozano's house. One of the cars left within ten minutes, and Lara and the other vehicle remained at the house. About two hours later, another vehicle, a Nissan Maxima, arrived, and its occupants went inside with Diaz-Lozano and Lara. The Nissan Maxima and its occupants left after about twenty-five minutes, and shortly thereafter California Highway Patrol stopped the vehicle and seized 1.5 pounds of methamphetamine.

This sequence of events supports the district court's approximation that the entire transaction involved the five pounds of actual methamphetamine alluded to in the phone call. Moreover, the district court did not err when it extrapolated the purity of the remainder of the methamphetamine from the purity of the drugs seized. *See United States v. Lopes-Montes*, 165 F.3d 730, 732 (9th Cir. 1999) ("[U]sing the purity of drugs actually seized to estimate the purity of the total quantity of drugs the defendant agreed to deliver is an appropriate method of establishing the base offense level.").

---

[2] In one conversation with undercover agent Robles, Diaz-Lozano used the term "shirt" to describe a pound of methamphetamine.

b. The district court also properly declined to grant a downward adjustment for acceptance of responsibility under Guidelines section 3E1.1(a), as Diaz-Lozano raised a factual defense at trial, arguing that he was "merely present" during the charged conduct. *See United States v. Wilson*, 392 F.3d 1055, 1063 (9th Cir. 2004) (denying a downward adjustment for acceptance of responsibility where the defendant disputed his involvement in a drug conspiracy and "maintained his factual innocence during and after trial").

c. The district court also did not err in applying an upward adjustment based on the reasonably foreseeable possession of firearms by Diaz-Lozano's co-conspirators at the Gilroy stash house during the commission of the offense. *See* U.S.S.G. §§ 1B1.3(a)(1)(B), 2D1.1(b)(1). The presence of the firearms at the house where drugs were being stored indicates that the firearms were connected to the methamphetamine conspiracy for which Diaz-Lozano was convicted. The district court did not clearly err in finding the presence of those firearms reasonably foreseeable to Diaz-Lozano. *See United States v. Alvirez*, 831 F.3d 1115, 1121 (9th Cir. 2016) ("We review a district court's findings of fact to support a sentencing enhancement for clear error."). Several pieces of evidence link Diaz-Lozano directly to the Gilroy stash house where the two firearms were recovered: he received deliveries of several pounds of drugs which came from the

stash house; he referred in both intercepted phone calls and in conversations with an undercover agent to San Jose as his source of drugs, which was understood by investigators to refer to Gilroy; ledgers at the Gilroy house listed Diaz-Lozano's name; and Diaz-Lozano told an undercover agent that he had previously brought 10 pounds of methamphetamine (either personally or by sending someone else) from San Jose (again, understood to refer to Gilroy) to Sacramento. Moreover, Diaz-Lozano knowingly participated in a large scale drug conspiracy. He indicated to undercover agents that the people he purchased methamphetamine from were associated with La Familia, a Mexican drug cartel, and he admitted to delivering drug proceeds to Mexico.

In *United States v. Garcia*, we held that the defendant "should reasonably have foreseen that [his co-conspirator] would possess a gun during the execution of such a major drug sale," where "the drug transaction involved approximately 17 kilograms of cocaine, and the negotiations leading up to the sale lasted nearly one month." 909 F.2d 1346, 1350 (9th Cir. 1990). Here, Diaz-Lozano was involved in a large-scale trafficking operation, lasting nearly one year and yielding over 600 pounds of drugs. Given Diaz-Lozano's connection to the Gilroy stash house and his knowledge of the scale of the drug conspiracy, the district court did not clearly

err in finding the possession of dangerous weapons by co-conspirators to be reasonably foreseeable to Diaz-Lozano.

d. There is not, however, sufficient evidence in the record to support the three-level upward adjustment for an aggravating role under Guidelines section 3B1.1(b).  The district court based the three-level upward adjustment on the marijuana conspiracy alone, finding evidence that Diaz-Lozano supervised Roberto Bermudez-Ornelas, who helped tend the marijuana gardens.  But there is no evidence that the marijuana conspiracy involved more than five people or was otherwise extensive, as is required by the guidelines for the three-level upward adjustment. *See* U.S.S.G. § 3B1.1(b).  Nor is there evidence that the marijuana and methamphetamine conspiracies were connected; the conspiracies were charged separately and involved only one overlapping defendant apart from Diaz-Lozano.

On remand, the district court may consider whether there is sufficient evidence of Diaz-Lozano's managerial or supervisorial role as to the methamphetamine conspiracy to support the three-level upward adjustment, or, alternatively, whether a two-level adjustment is appropriate.

CONVICTION AFFIRMED, SENTENCE VACATED and REMANDED.